JS-6

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

9
10
11

| | |
|---|---|
| EVERYDAY DISCOUNT, INC., | CASE NO. CV 18-902-GW-PLAx |
| Plaintiffs, | |
| vs. | **JUDGMENT** |
| STATE FARM GENERAL INSURANCE COMPANY, a Corporation and DOES 1 through 100, | Trial:  4/30/19-5/2/19; 7/29/19 |
| Defendant. | Judge:  Hon. George H. Wu |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**[PROPOSED] JUDGMENT**

In the bench trial before the Honorable George H. Wu  in the instant matter, evidence was taken between April 30, 2019 and May 2, 2019 and the oral closing argument took place on July 29, 2019.

On October 14, 2020, the court issued its "Post-Trial Findings of Fact and Conclusions of Law," finding in favor of Defendant State Farm General Insurance Company ("State Farm")  and against Plaintiff, Everyday Discount, Inc. ("Everyday Discount"). A true and accurate copy of the court's Post-Trial Findings of Fact and Conclusions of Law is attached as Exhibit A.

In summary, in this breach of insurance contract case, the court determined Everyday Discount's intentional misrepresentations of material facts regarding the fire loss claim it made to State Farm violated the "Concealment, Misrepresentation or Fraud" clause of the insurance policy issued to Everyday Discount, thereby precluding coverage for the loss under the insurance policy issued to Everyday Discount.

The court found that Mike Azartash, as the authorized designee to speak for Everyday Discount regarding the insurance claim, "violated the fraud provision of the Policy by concealing, misrepresenting and/or lying about his knowledge of and/or involvement in the: (1) placement of and/or additions to the security cameras both inside and outside the building; (2) the placement and/or removal or additions to the security cameras both inside and outside the building; (3) the presence and functioning of the DVR recorder; and (4) the operations of the security/surveillance system." (Ex. A., at page 14 of 18).

**ACCORDINGLY,  IT IS ORDERED, ADJUDGED AND DECREED** that:

1. Judgment be entered in favor of defendant State Farm General Insurance Company and against plaintiff Everyday Discount, Inc.;

2. That the action is dismissed on its merits; and

1    3.  That Defendant State Farm General Insurance Company shall recover its

2         costs of suit.

3    **IT IS SO ORDERED**

4

5

6    DATED: October 20, 2020                    _____

7                                               Hon. George H. Wu
                                                United States District Judge

**[PROPOSED] JUDGMENT**

**EXHIBIT A**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-902-GW-PLAx | Date | October 14, 2020 |
|---|---|---|---|
| Title | *Everyday Discount, Inc. v. State Farm General Insurance Company* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

PROCEEDINGS:    **IN CHAMBERS - POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Attached hereto is the Court's Post-Trial Findings of Fact and Conclusions of Law. The Court finds in favor of the Defendant and against Plaintiff. Defendant is to prepare a proposed judgment.

                                                                    :

Initials of Preparer    JG

***Everyday Discount, Inc. v. State Farm Gen. Ins. Co.***, Case No. 2:18-CV-00902-GW
Post-Trial Findings of Fact and Conclusions of Law

## I.  **Background**

Everyday Discount, Inc. ("Plaintiff") brought this action against State Farm General Insurance Company ("Defendant") for breach of contract and breach of the "obligation of good faith."  Plaintiff's Complaint alleged that, on or about October 28, 2015, Plaintiff had an insurance policy with Defendant wherein Defendant agreed to indemnify Plaintiff for any damages Plaintiff sustained as a result of fire.[1]  *See* Complaint ¶ 5, Docket No. 1-2.  On that date, Plaintiff's retail store and attached warehouse suffered a conflagration that destroyed and/or damaged most of its inventory; but Defendant eventually refused to reimburse Plaintiff for the suffered loss.  *See id.* ¶¶ 7-8, 12.

On December 14, 2018, the parties filed a stipulation to waive a jury trial and "to dismiss, with prejudice, any extra contractual claims, allegations and prayed for damages, including, without limitation, bad faith/breach of the implied covenant of good faith and fair dealing/unreasonable claim handling allegations, *Brandt* attorney's fees, valuation of business damages, punitive damages and the like ('bad faith allegations/claims') and further agree[d] that Everyday Discount will only pursue its breach of contract claim, limited to policy limits of $1 million."  *See* Docket No. 36.  This Court issued an Order pursuant to the stipulation which resulted in the breach of contract's being the only remaining claim.  *See* Docket No. 38 at 2.

A court trial was conducted.  Pursuant to Fed. R. Civ. P. 52(a), the Court issues the following findings of fact and conclusions of law.

## II.  **Findings of Fact**

### A.  Background Facts

Plaintiff was engaged in a retail and wholesale business selling various discounted merchandise operating from leased premises located at 5701 Pacific Blvd., Huntington Park, CA 90255 ("Premises").  Defendant issued to "Nima Azartash DBA Everyday Discount" Insurance Policy No. 92-C5-Q141-0 ("Policy") which covered losses of business personal property at the Premises due to fire.  *See* Stipulations of Fact ("Stipulations") at ¶ 7, Docket No. 50.  Section I and

---

[1] The insurance policy did not cover damages or lost to the building located at the premises, which was owned by Peter Prajin and was insured through Liberty Mutual Insurance Company.  *See* Declarations page of State Farm General Insurance Company Policy No. 92-C5-Q141-0, Trial Exhibit No. 43.

Section II (Common Conditions) of the Policy in paragraph 3 state that:

> **Concealment, Misrepresentation or Fraud.**   This policy is void in any case of fraud by you as it relates to the policy at any time.  It is also void if you or any other insured intentionally conceal or misrepresent a material fact concerning:
>> a. this policy;
>> b. the covered property;
>> c. your interest in the covered property; or
>> d. a claim under this policy.

*Id.*; *see also* Trial Exhibit ("Tr. Ex.") 43 at 34.  Section I (Conditions) in paragraph 3 of the Policy provides that:

> **Duties in the Event of Loss.**   You must see that the following are done in the event of loss to covered property:
>> * * * *
>>> f. permit us to inspect the property and records proving the loss;
>>>
>>> g. if requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records.  In such event, your answers must be signed;
>> * * * *
>>> i. cooperate with us in the investigation or settlement of claim . . . .

Stipulations at ¶ 7; Tr. Ex. 43 at 18-19.

At approximately 3:30 a.m. on October 28, 2015, a fire broke out at the Premises.  *See* Stipulations at ¶ 1.  The Everyday Discount location was equipped with an entry alarm system that was armed/disarmed by way of a keypad at the business.  *Id.* at ¶ 2.  On October 27, 2015, at approximately 7:09 p.m., the alarm system was engaged – meaning that a signal had been sent to the central monitoring station[2] that the system was armed.  *Id.* at ¶ 3.  At the time the alarm system was activated at 7:09 p.m. on October 27, 2015, it was properly functioning.  *Id.* at ¶ 4.  Between 7:09 p.m. on October 27, 2015 and the approximately 3:30 a.m. on October 28, when the fire department arrived on the scene and thereafter entered the building, the system had not been disarmed.  *Id.* at ¶ 5.  However, during the conflagration and the fire fighters' entries into the building, the alarm did not trip nor was it triggered – meaning that a signal was not sent to the central monitoring station that the building premises had been breached.  *Id.* at ¶ 6. At or around the time of the fire, the building housing the business was equipped with security cameras, both inside and outside.  *Id.* at ¶ 8.

---

[2] Plaintiff's alarm system was monitored by Allstate Alarm System ("AAS").  *See* Tr. Ex. 50.

Mike Azartash[3] is the named insured's father and an Everyday Discount employee who was the authorized designee to speak for Plaintiff regarding the claim. *Id.* at ¶ 9. On October 29, 2015, Everyday Discount reported the fire and made a claim to State Farm. *Id.* at ¶ 10.

Defendant retained a company (*i.e.* Strictly Contents) to examine and evaluate the loss at the Premises and to prepare an inventory report as to the merchandise damaged/destroyed by the fire. *See* Transcript of 4/30/2019 Trial Testimony ("Tr. Trans.") at 84, Docket No. 75. Plaintiff's employees Marlene Lopez[4] and Carlos Barrera assisted in that endeavor. *See* Stipulations at ¶ 11. On January 29, 2016, Strictly Contents provided Defendant with a report setting the loss/damaged merchandise at $269,809.32. This report contained 4,836 separate line item categories. *Id.* at ¶ 12. On March 15, 2016, Defendant sent Plaintiff the Strictly Contents inventory report for its review and input. *Id.* at ¶ 13. On August 1, 2016, Defendant received Plaintiff's Proof of Loss totaling $1,338,201.79 for merchandise identified to be a total loss. *Id.* at ¶ 14. The $1.3 Million Proof of Loss included the following separate categories: (1) Inventory Per Strictly Contents $787,221.19, (2) Showroom Fixtures $57,879.00, (3) Office Furniture & Electronics $56,565.00, and (4) Warehouse Out of Sight Contents $436,536.60. *Id.* at ¶ 15.

Richard Guerrero, who at the time worked for Defendant as a member of its "special investigative unit" which explored *inter alia* suspicious conflagrations, was assigned to look into the Plaintiff's claim on October 30, 2015. *See* 4/30/2019 Tr. Trans. at 27-31. Defendant had received a report from Los Angeles County Fire Department Investigator Brian Nicholson that the fire was suspicious and raised several questions. *Id.* at 32, 36. On October 30, 2015, Guerrero hired Daniel Bonelli (who is the owner of Advanced Analysis, Inc. ("AAI"), a property investigation company) to determine the origin and cause of the fire at the Premises.[5] *See* 4/30/2019 Tr. Trans. at 46-47; *see also* 5/1/2019 Tr. Trans. at 76-77, Docket No. 76; the 3/13/2016 Advanced Analysis Origin and Cause Report ("AAI Report"), Tr. Ex. 46 at CF00710.[6]

---

[3] Mike Azartash will sometimes be referenced hereinafter as "Azartash;" Nima Azartash, his son, will be referred to as "Nima" or "Nima Azartash."

[4] Neither side called Marlene Lopez to testify at trial.

[5] Bonelli had been previously been employed by the Riverside County Fire Department and, by the time he gave his testimony in this case, he had personally determined the origin/cause of over 6,000 fires and been the supervising investigator on about 12,000 other incidents. *See* 5/1/2019 Tr. Trans. at 75, 81, Docket No. 76.

[6] The AAI Report is Bate-stamped in reverse order such that the first page is "CF00711" and the second page is "CF00710," etc.

During the course of his investigation, Bonelli visited the Premises on five occasions between November 2 and December 22, 2015.  *See* 5/1/2019 Tr. Trans. at 79-80, Docket No. 76; *see also* AAI Report at CF00708.  At the Premises, he: (1) examined all relevant spaces, (2) drew diagrams, (3) took many photographs, and (4) collected seven one-gallon cans of fire debris, three one-gallon cans of concrete core samples, the security alarm panel from the office area, and the fire alarm panel from the warehouse area.  *See also* AAI Report at CF00708, Tr. Ex. 43.  He also conducted interviews with 22 persons including: (1) Mike Azartash, (2) Nima Azartash, (3) "Abrahim aka Ebby," the representative from All Alarm Systems, (4) Camile Atwood (the claims representative) and Jim Brown (the private fire investigator) for Liberty Mutual Insurance which insured the building, (5) Russ Bohse, a private fire investigator who worked for Nationwide Insurance which had insured a previous business involving Mike Azartash which had experienced an undetermined fire, (6) two AFT agents, (7) Carlos and Lulu who were Plaintiff's employees, (8) Brian Nicholson with the Los Angeles County Fire Department, (9) Peter Prajin, the owner of the Premises and the building, (10) Gilbert Gomez, Peter Prajin's handyman, (11) Officer Valle of the Huntington Park Police Department, (12) Jed Holsey, the Fire Marshall for the Vernon Fire Department, (13) Nate Nahmias, a public adjuster representing the insured, (14) Long Nguyen, a forensic engineer, and (15) Mike Koster, an accelerant detecting canine handler.  *Id.* at CF00708-705.

Bonelli reported to the Defendant that:

1)  Although the fire was determined to have originated in the storage warehouse area of the Premises, its exact point of origin therein and precise cause could not be determined because of the extensive activity of the Los Angeles County Fire Department in putting out the conflagration (which included the use of a bulldozer to deal with smoldering debris).  *See* AAI Report at CF00705; *see also* 5/1/2019 Tr. Trans. at 86-89.

2)  Spalling of the concrete floor at the center of the warehouse was consistent with the initial observations of fire fighters responding to the scene.  Subsequently, an accelerant detecting canine alerted to flammable accelerants at a number of locations on the warehouse floor, and collected samples were found positive for a "middle petroleum distillate."  However, such distillates were present in a number of products (such as butane lighters or propane camping fuel) which were purportedly sold by Plaintiff; and, hence, their presence could not establish an intentional displacement of flammable liquids as a fire accelerant.  *See* AAI Report at CF00704, -696, -693, and -690; *see also* 5/1/2019 Tr. Trans. at 83-88, 100.

3)  Electrical power was "on" at the Premises at the time of the fire.  There were at least four surveillance cameras on the outside walls of the building and four inside of the building.  A newly installed digital video recorder ("DVR") servicing the surveillance

cameras was missing from the office area of the Premises (which had not suffered the full brunt of fire damage); and the camera cables had been disconnected from the DVR and were found hanging from the office wall.  *See* AAI Report at CF00704, -702, -700-697, and -690; *see also* 5/1/2019 Tr. Trans. at 171.

4)  The Premises had an alarm system which covered breaches into the building and had the capacity to detect the presence of fire.  The system was active and monitored up until the day preceding the fire.  A report from AAS showed that the alarm system was set on 7:09 p.m. on October 27, 2015.  On the night of the fire, there was no alarm activation even when various entries into the Premises were made by the firefighters *and* while the building was on fire.  The alarm company had no explanation as to why no alarms were set off.  *See* AAI Report at CF00704, -692, and -690; *see also* 5/1/2019 Tr. Trans. at 120.

5) Bonelli initially interviewed Mike Azartash on November 2, 2015, who stated, *inter alia*, that: (1) he was generally unfamiliar with the camera system, and (2) while the owner of the Premises had installed exterior security cameras, there were no cameras inside for the business.  *See* AAI Report at CF00693; *see also* Tr. Ex. 53 at 6-7.  Gilbert Gomez, a handyman, reported that, prior to the fire, Azartash had hired him to install additional exterior and interior cameras on the Premises.  *See* AAI Report at CF00691.

6)  When Bonelli questioned him about previous losses due to fires, Azartash initially indicated that Plaintiff had only suffered one prior fire which was at its last location on 26th Street in Vernon, California ("Vernon Location") about three years earlier.  A short time later, Azartash told Bonelli that Plaintiff had experienced two additional earlier fires at its business when it was located on Bandini Street and on 44th Street, both in Vernon.  *See* AAI Report at CF00692.

7)  Brian Nicholson, an investigator with the Los Angeles County Fire Department, told Bonelli that while he was at the Premises the day after the fire, two vendors showed up and claimed that Mike Azartash had written them bad checks.  *See* AAI Report at CF00691.

8) Peter Prajin, one of the owners of the Premises, informed Bonelli that the Plaintiff was one month late in the rent.  He also stated that, after the fire, "an old business partner of Mike Azartash . . . stopped by the property and indicated that Mr. Azartash has done this before, referring to the fire."  *Id.*

9)  Russ Bohse, a private fire investigator who had been assigned to determine the origin of the fire at the Plaintiff's Vernon Location more than one year earlier, stated that that conflagration's cause was suspicious but could not be determined.  However, the circumstances of that fire had a number of common elements with the conflagration herein − including the facts that: (1) the fire originated in the center of the warehouse area, and (2) the DVR at the property was also found missing.[7]  *See* AAI Report at CF00690.

On December 1, 2015, during a recorded interview by Guerrero, Azartash stated, *inter alia*,

---

[7] Guerrero testified that, early on in his investigation, he discovered that Plaintiff had reported a commercial fire loss on April 10, 2013, which had similarities to the October 28, 2015 conflagration including the facts that: (1) the insurance policy was less than a year old at the time of the blaze, (2) the fire occurred at night, and (3) the cause of the fire, while suspicious, was undetermined.  *See* 4/30/2019 Tr. Trans. at 33.

that: (1) he had only seen a video recorder in the office "a long time ago" and he believed the owners of the building had taken it away (*see* Tr. Ex. 52 at CRDOCS 0132); (2) he did not know if the security cameras were operating or if they would record anything (*Id.* at CRDOCS 133); and (3) he did not know if Plaintiff "or anyone in the business . . . added more security cameras to the building" (*Id.* at CRDOCS 145).  Azartash was also examined under oath on May 12, 2016, wherein he stated, *inter alia*, that: (1) on the second floor of the Premises there were three rooms – a music room which was used by Nima Azartash and not part of Plaintiff's business, and two showrooms where some items would also be kept for storage (*see* Tr. Ex. 69 at 125); (2) he didn't think that there were any DVR recorders at the Premises (*Id.* at 186); (3) there were at least four outside security cameras which had been placed on the Premises by the building's owners which Plaintiff used but did not move, and that Plaintiff had not added or removed any cameras (*Id.* at 186-87); (4) inside the building, there two cameras one close to the cash register and another in the showroom  (*Id.* at 188); (5) a television monitor for the cameras was removed a few months before the fire, he presumed by the landlord who owned it (*Id.* at 188-91); and (6) he was unaware of any recording devices attached to the cameras (*Id.* at 190).

On or about January 27, 2017, Defendant received a report from an alarm systems expert (Jeffrey D. Zwirn, President of IDS Research & Development) who, based on review of the available evidence (including examination of the DSC Power 832 Security System Control Panel which he had been removed intact from the Premises) concluded *inter alia* that: (1) the "Security System Control Panel Housing was not damaged by the Fire and/or by the Fire Department's extinguishment efforts;" (2) "The Security System was 'armed' before the Fire was detected;" (3) "The Security System should have activated multiple times during the early stages of the Fire and transmitted alarm signals to the Central Monitoring Station;" (4) "The Security System was bypassed and/or tampered with from the inside of the premises before the alarm system was 'Armed';" and (5) "It is more likely than not, that the Digital Video Recorder  . . . was carefully removed from the premises before the fire was initiated within same, in an effort to eliminate its ability to provide evidence, as to who started the fire inside the protected premises."  *See* Tr. Ex. 47 at 15.

Following additional investigative steps, on April 26, 2017, Defendant sent to Plaintiff notice that it was denying its claim based upon the Plaintiff's violation of the "Concealment, Misrepresentation or Fraud" and "Duties in the Event of Loss" provisions of the Policy for the

following reasons: (1) "Misrepresentations regarding the security cameras and prior fire losses," (2) "Misrepresentations regarding the DVR," (3) "Questionable circumstances surrounding the burglar alarm's failure to activate at the time of the fire," (4) "Misrepresentations regarding relocation and resumption of Everyday Discount's business," (5) "Misrepresentations regarding the invoices submitted in support of the revised Strictly Contents Inventory," (6) "Misrepresentations regarding the Via Trading invoices submitted in support of the claim," (7) "Questionable Out of Sight Inventory," (8) "Questionable Showroom Fixtures and Equipment Inventory," and (9) "Misrepresentations regarding the financial condition of Everyday Discount prior to the loss."[8]  *See* Tr. Ex. 9 at 1-8.

    B. Impactful Evidence at Trial[9]

    1) *Richard Guerrero*: Guerrero established the investigative steps taken by Defendant as delineated in Section II-A, *supra*.

    2) *Carlos Barrera*: Berrera has worked for Mike Azartash for ten years. *See* 4/30/19 Tr. Trans.. at 117.  Berrera testified that prior to the fire, there were two rooms on the second floor of the Premises which were full of merchandise, but immediately after the fire he did not go upstairs because he was told it was too dangerous.  *Id.* at 123-24.  He did not remember having any involvement in preparing any inventories of merchandise for Everyday Discount's insurance claim. *Id.* at 136.

    3) *Loudes Manalac*: Manalac has worked for Azartash for over 30 years as a bookkeeper/secretary. *Id.* at 137-38.  She shared an office with him at the Premises. *Id.* at 151. In between her desk and his desk was a DVR which connected television monitor(s) to security cameras that were located both on the outside and inside of the Premises. *Id.* at 153-54.  At one point, there was a small television monitor in the office where you could see both persons in the warehouse and also in the retail store. *Id.* at 159-60.  She does not believe that the system was functional immediately before the fire because the larger television monitor outside of the office was not working. *Id.* at 154-55.

    4) *Mike Azastash*:  Prior to the closing arguments of counsel, the Court informed both

---

[8] At the trial, Defendant did not rely in any way Reasons Nos. 4, 5, 6, 8 and 9.  *See, e.g.,* 7/29/2019 Tr. Trans. of closing arguments at 16-19, Docket No. 101.

[9] This section does not attempt to summarize all of the evidence that was proffered at the trial.  It merely notes that evidence which made an impact on the trier of fact for purposes of the decision in this action.

sides that its first finding was that Mike Azartash was not a credible witness.  *See* 7/29/19 Tr. Trans. at 3, Docket No. 101.

5) *Bernard Melo*: Melo was an on-line salesperson at Everyday Discount.  *See* 5/1/19 Tr. Trans. at 52, Docket No. 76.  He recalled that there was a "computer tower" which was being used as a DVR into which the Premises' cameras and television monitors were connected.  *Id.* at 53-54, 62-64.

6) *Daniel Bonelli*: Bonelli established the results of his investigation as set forth in Section II-A, *supra*.  He also opined that the DVR was very important because its recording would have greatly helped in determining the cause of the fire and if any person was involved.  *See* 5/1/19 Tr. Trans. at 95-96.  A few days after the fire, Bonelli was at the scene searching for the DVR and discovered that the cables into the device has been disconnected and the DVR was missing.  *Id.* at 108-11.

7) *Juventino Ortega*: Ortega worked for Strictly Contents and was part of the team that document the fire loss at the Premises.  *See* 5/1/19 Tr. Trans. at 153-54.  He stated that when he went up to the second floor: (1) he could not inspect the entire floor because there were safety issues (*Id.* at 157-58); (2) he was, however, able to see the entire floor (*Id.* at 158); (3) he took photographs (*Id.* at 155-57); and (4) aside from a closet full of boxes, there was no other merchandise which he could see on the second floor (*Id.* at 157-59, 164-65).

8) *Gilbert Gomez*: Gomez testified that he was the handyman for Peter Prajin (one of the owners of the Premises) and that, during the relevant period of time, he also did work for Mike Azartash.  *See* 5/1/2019 Tr. Trans. at 166-68.  Gomez stated that, prior to the fire, Azartash asked him to relocate certain of the outside security cameras and also to add two additional outside cameras, which he did.  Id. at 169-70.  Azartash further hired Gomez to reposition three of the interior cameras and to add an additional interior camera.  *Id.* at 170-71.  Gomez stated that after he completed the work, one had a "full view of [the] whole warehouse" and other portions of the building.  *Id.* at 171.

The relocation of the old cameras addition of the new ones required rewiring of the entire system and the purchase of a new DVR monitoring/recording component which had the capacity for coaxial cables for the eight cameras.  *Id.* at 172-76.  The DVR in turn was hooked up to a television monitor wherein one had a view from all eight cameras.  *Id.* at 176.  The cameras had "night vision" and the DVR had the capacity to record up to 30 days at a time.  *Id.* at 188-89.  The

DVR was located in the office.  Two days prior to the fire, Gomez was at the Premises and observed that the cameras and DVR were working with images displayed on the television monitor.  *Id*. at 176-77.

Two days prior to the fire, Gomez had complained to Azartash that there was too much merchandise blocking the stairway and second floor when he had to go to the roof to make repairs. *Id.* at 183-84.

9) *Jeffrey Zwirn*: Zwirn was Defendant's expert on alarm systems.  He credibly established the findings in his expert report.  *See* Tr. Ex. 47.  The Court accepts Zwirn's testimony that the only explanation for Plaintiff's alarm system's not activating during the early morning hours of the fire was that someone with alarm code bypassed the system's trigger settings at the Premises.[10] *See* 5/2/19 Tr. Trans. at 4-19, Docket No. 79.

10) *Steve Kaufer*:  Kaufer was Plaintiff's alarm expert.  *Id.* at 59-60.  The Court finds Zwirn to be more qualified than Kaufer and also finds the former's testimony to be more credible and persuasive than the latter's.[11]  *Id.* at 115.

### III.  Analysis

####   A.  Applicable Law

Plaintiff's sole remaining cause of action in this litigation is breach of the insurance contract by Defendant's refusal to pay its claim.  However, because there is no dispute as to the existence of the policy or Defendant's refusal to pay Plaintiff's claim, the gist of this lawsuit is not that cause of action itself but rather the two affirmative defenses which Defendant has litigated at

---

[10] Zwirn also testified that one could not bypass the system remotely because the system does not have an "app" so "there is no access to get into the panel that way."  *See* 5/2/19 Tr. Trans. at 54-55.

[11] On May 14, 2020, Plaintiff filed a Motion to Introduce Post-Trial Exhibits which, as proffered, were: (1) "[the alarm system] manufacturer's specifications for the burglar alarm involved herein to show that it was of the type that resets itself and, therefore, defense expert Mr. Zwirn's testimony regarding his testing of the alarm, and his opinions based thereon, are for naught[; and (2)] To permit the testing of the alarm herein and introduce the alarm's recordation of the last 128 entries to show that the alarm herein was never tampered with."  *See* Docket No. 94 at 2 of 9.  This Court denies that motion.  First, as Plaintiff readily admits, there is no delineated procedure which authorizes its motion.  The cases – to which it referred, *see, e.g.*, *Viskase Corp. v. American Nat'l Can Co*., 261 F.3d 1316, 1324 (Fed. Cir. 2001) – involved post-judgment motions for relief from a final judgment under Fed. R. Civ. P. 60(b).  While Plaintiff contends there should be no difference between a Rule 60(b) motion made after a judgment and such a motion made before a decision on the case, this Court disagrees.  Further, even if this Court were to entertain the motion on its merits, it would still deny it.  Zwirn's testimony at trial was consistent with his pre-trial reports.  Plaintiff has offered no reason why the evidence which it now wants to proffer post-trial could not have been obtained before the trial and submitted during the trial itself.  Finally, Plaintiff's assertion that its "new" evidence would demonstrate that Zwirn perjured himself rests on its peculiar reading of Zwirn's testimony with which this Court does not agree.  *See, e.g.,* Zwirn's testimony at 5/2/19 Tr. Trans. at 93-95.

the trial, *i.e.* (1) voiding the policy because of fraud, concealment or misrepresentation, and (2) breach of the insured's duty to cooperate as set forth in a material provision of the Policy.  When the insurer raises an affirmative defense to a breach of the insurance contract claim, it bears the burden of proof.  *See Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 964 F.3d 804, 811 (9th Cir. 2020).

*1)   Fraud, concealment or misrepresentation as to a claim by an insured*

As stated in Crosky, Heeseman, Ehrilch & Klee, CAL. PRAC. GUIDE: INSURANCE LITIGATION (The Rutter Group 2020) ("*Insurance Litigation*") ¶ 5:249:

> The insured's *intentional* concealment or misstatement of "material" facts in a *claim* for policy benefits (as distinguished from the insurance application) entitles the insurer to *void* the insurance contract. [*Cummings v. Fire Ins. Exchange* (1988) 202 CA3d 1407, 1418-1419, 249 CR 568, 574]
>
> *     *     *     *
>
> Effect: If an insured *knowingly* makes a false statement as to the nature or amount of a covered loss, the insurer can rescind the policy *from that time forward*. Alternatively, without rescinding, the insurer may simply deny the claim on the ground of fraud because fraudulent claims are usually expressly excluded. [*See Feldman v. Allstate Ins. Co.* (9th Cir. 2003) 322 F3d 660, 670 . . . . ]

*Insurance Litigation* at ¶ 5:249 (emphasis in original).[12]  Further, as stated in *Cummings v. Fire Ins. Exchange,* 202 Cal.App.3d 1407 (1988):

> in order to void a policy based upon the insured's violation of the standard fraud and concealment clause . . . , the false statement must have been knowingly and wilfully made with the intent (express or implied) of deceiving the insurer. The materiality of the statement will be determined by the *objective* standard of its effect

---

[12] The Judicial Council of California Civil Jury Instruction ("CACI") 2309 provides that:

> 2309 - Termination of Insurance Policy for Fraudulent Claim
>
> [*Name of insurer*] claims that [*name of insured*] [*is not entitled to recover under/is not entitled to benefits under*] the insurance policy because [*he/she/nonbinary pronoun*] made a false claim. To establish this claim, [*name of insurer*] must prove all of the following:

- 1. That [*name of insured*] made a claim for insurance benefits under a policy with [*name of insurer*];
- 2. That [*name of insured*] represented to [*name of insurer*] that [*insert allegedly false representation*];
- 3. That [*name of insured*]'s representation was not true;
- 4. That [*name of insured*] knew that the representation was not true;
- 5. That [*name of insured*] intended that [*name of insurer*] rely on this representation in [*investigating/paying*] [*name of insured*]'s claim for insurance benefits; and
- 6. That the representation that [*insert allegedly false representation*], if true, would affect a reasonable insurance company's [*investigation of/decision to pay*] a claim for insurance benefits.

CACI 2309 does not contain any requirement that the insurer show that it was actually prejudiced by the insured's misrepresentation.

upon a *reasonable* insurer.

*Id.* at 1414-15 n.7 (emphasis in original).[13]   False answers to any material question by the insurer are sufficient to establish the insured's fraudulent intent.  *See Insurance Litigation* at ¶ 5.253; *see also Cummings*, 202 Cal.App.3d at 1416 ("if the matter were material and the statement false, to the knowledge of the party making it, and willfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts.").[14]

In the insurance context, a misrepresentation is a "false answer as to any matter of fact, material to the inquiry, knowingly and willfully made, with intent to deceive the insurer." *Cummings*, 202 Cal.App.3d at 1416-17; *see also Essex Ins. Co. v. Hartford Fire Ins. Co.*, No. CV-12-05067-DMG-(DTBx), 2013 WL 3389549, at *7 (C.D. Cal. July 8,2013).  In California, whether a fact is "material" is determined by its "prospective reasonable relevance to the insurer's inquiry." *Cummings*, 202 Cal.App.3d at 1417; *see also Essex Ins. Co.*, 2013 WL 3389549, at *7; *Ram v. Infinity Select Ins.*, 807 F.Supp.2d 843, 853 (N.D.Cal.2011).  It "is not defined and determined by the effect it has on the outcome of the investigation.  Rather, a question and answer are material when they relate to the insured's duty to give to the insurer all the information he has as well as other sources of information so that the insurer can make a determination of its obligations." *Cummings*, 202 Cal.App.3d at 1416.  A statement need not relate only "to a matter which ultimately proves to be significant in the ultimate disposition of the claim.  *Rather, if the*

---

[13] As stated in *Fay Avenue Properties, LLC v. Travelers Property Cas. Co. of America*, No. 11-cv-2389-GPC-(WVG), 2014 WL 4854684, at *11 (S.D. Cal. Sept. 23, 2014): "An insurer must prove the following elements to demonstrate fraud or concealment sufficient to void an insurance policy: 1) Plaintiff made a false statement; 2) Plaintiff knew the statement was false when made; 3) the statement was material; and 4) Plaintiff intended to deceive Defendant."

[14] *See Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 94-95 (1884):

> The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims.  And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured.  A false answer as to any matter of fact material to the inquiry, knowingly and wilfully made, with intent to deceive the insurer, would be fraudulent.  If it accomplished its result, it would be a fraud effected; if it failed, it would be a fraud attempted.  And if the matter were material and the statement false, to the knowledge of the party making it, and wilfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts.

*misrepresentation concerns a subject reasonably relevant to the insured's investigation, and if a reasonable insurer would attach importance to the fact misrepresented, then it is material.*"  *Id.* at 1417 (emphasis in original).

Defendant relies in large part on the decision in *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179 (2d Cir. 1984).[15]

---

[15] In *Fine*, plaintiff insured owned buildings which were destroyed in a fire of unknown origin.  *See* 725 F.2d at 180.  Prior to the fire, in an effort to force out existing tenants, plaintiff had engaged in a "freeze-out" policy which included setting the heating system such that it would not start up until a sub-freezing temperature was reached.  On the night of the fire, the buildings' sprinkler system did not engage because of ice blockage.  It was determined that, had the sprinklers functioned properly, the fire could have been controlled.  *Id.*  The insurance policy covering the buildings included, *inter alia*, the following three provisions: (1) a "protective maintenance" clause which required that protective systems and warning devices be kept in complete working order, (2) an "increased hazard" clause which voided coverage if "the hazard is increased by any means within the knowledge of the insured," and (3) a "false swearing" clause which voided coverage if "the insured has willfully concealed or misrepresented any material fact concerning the insurance or the insured property, or in the event of any 'fraud or false swearing by the insured' relating to any such material fact."  *Id.* at 181.

The insured and the buildings' superintendent both falsely told the insurer that they had maintained the sprinkler system and had been setting the heat control for the boiler at 40 degrees, although they had actually set the control at between 25 to 30 degrees.  The insurer eventually denied plaintiff's claims on the bases of the three cited provisions.  After a court trial, the judge ruled in favor of the plaintiff even though he found that, while the plaintiff had made false statements under oath to the insurer, those misrepresentations were not material because − given the extremely cold temperatures during the relevant period − there was no evidence that a proper operation of the sprinkler system would have made any different on the night in question if the heat controller had been set at 40 degrees rather than at 25 or 30 degrees.  *Id.*

The Second Circuit reversed but solely on the "false swearing" issue.  In doing so, the Circuit stated:

> In our view, the trial judge's definition of materiality was far too restrictive and not in accordance with long-established case law.
>
> * * * * The law is clear that the materiality of false statements during an insurance company investigation is not to be judged by what the facts later turn out to have been.  The purpose of a provision requiring an insured to submit to an examination under oath is to enable the insurance company to acquire knowledge or information that may aid it in its further investigation or that may otherwise be significant to the company in determining its liability under the policy and the position it should take with respect to a claim.  Thus, the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding.

*Id.* at 183.  In reaching that conclusion, the Second Circuit cited to decisions from the Supreme Court and the Fifth and Tenth Circuits.  *See Claflin v. Commonwealth Insurance Co.*, 110 U.S. 81, 94-95 (1884); *Chaachou v. American Central Insurance Co.*, 241 F.2d 889 (5th Cir. 1957); *Long v. Insurance Co. of North America*, 670 F.2d 930, 934 (10th Cir. 1982).  In *Fine*, the court concluded its discussion by observing that:

> It thus appears that materiality of false statements is not determined by whether or not the false answers deal with a subject later determined to be unimportant because the fire and loss were caused by factors other than those with which the statements dealt.  False sworn answers are material if they might have affected the attitude and action of the insurer.  They are equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.

*Id.* at 183.

Although *Fine* was decided under New York law, the author of that decision was Judge Irving Hill, who was a Senior United States District Judge for the Central District of California, sitting by designation.  *See* 725 F.2d at 180.  Further, *Fine* was cited and relied upon in the *Cummings* decision.  *See* 202 Cal.App.3d at 1417.

*2)  Failure to cooperate in the investigation of a claim*

Insurance policies usually require the insured to cooperate with the insurer in the latter's investigation of a claimed loss.  *See Insurance Litigation* at ¶ 6:59.  An insurer can raise − as a defense to a claim − the breach by the insured of the duty to cooperate with the investigation of that claim.  *See Campbell v. Allstate Ins. Co.*, 60 Cal.2d 303, 306 (1963).  However, the insurer bears the burden of proving that it was "substantially prejudiced thereby." *Id.* (although the insured was found to have failed to cooperate with the insurer because he left town after an automobile accident and would not contact the insurer, it was held that the failure would not justify a denial of the claim because the insured was shown to have been clearly at fault and, hence, there was no prejudice because the insurer would have been found liable on its policy even if the insured had cooperated.).  An interesting variation was presented in *Othman v. Globe Indem. Co.*, 759 F.2d 1458 (9th Cir. 1985) (overruled on other grounds by *Bryant v. Ford Motor Co.*, 844 F.2d 602 (9th Cir. 1987), where the insured's market was destroyed by fire and the insurer had reason to believe that the insured started the fire himself.  The insurer asked the insured for items such as his bank records, financial condition and the source of cash used to purchase his abnormally high inventory, which the insured initially refused to produce.  It was held that the requested information was material because it might help prove who set the fire, and that the insurer had the right to refuse payment of the claim until the insured provided the requested information.  *See* 759 F.2d at 1465.

B.  <u>Factual Conclusions and Application of the Law</u>

*1. Plaintiff did violate the fraud provision of the Policy*

The Court finds that Mike Azartash ("an Everyday Discount employee and Everyday Discount's authorized designee to speak for Everyday Discount regarding the claim," *see* Stipulations at ¶ 10) violated the fraud provision of the Policy by concealing, misrepresenting and/or lying about his knowledge of and/or involvement in the: (1) placement of and/or additions to the security cameras both inside and outside the building, (2) the placement and/or removal of television monitors for the security/surveillance system, (3) the presence and functioning of the DVR recorder, and (4) the operations of the security/surveillance system.

By the time of the conflagration on October 28, 2015, the Premise's alarm system (which was otherwise operable) had been bypassed by someone within the building with possession of the Plaintiff's alarm code such that, even though the system was armed, it would not be triggered by any breach of the building or by any fire starting within the Premises.  According to Azartash, the

only persons with knowledge of the alarm code and possession of a key to the Premises were Plaintiff's principals (*i.e.* himself and Nima Azartash) and three of its employees (*i.e.* Carlos Berrera,[16] Ebrahim Farahani, and "Fernando"). *See* Tr. Ex. 53 at 8.

At least two days prior to fire, there were security cameras both on the outside and inside of the Premises which were connected to a DVR recording device which in turn was connected to television monitors. As originally set up, the cameras were equipped with "night vision" and the DVR had the capacity for storage for up to 30 days. After the fire was extinguished and upon accessing the office wherein the DVR was kept, it was discovered missing and the cables from the cameras had been manually detached from the device.

The October 28, 2015 conflagration in this case bore a number of similarities to the April 10, 2013 fire at one of Plaintiff's prior business locations including: (1) the insurance policy was less than a year old at the time of the blaze; (2) the fire occurred at night; (3) the cause of the fire, while suspicious, was undetermined; (4) the fire originated in the center of the warehouse area; and (5) the DVR at the property was found missing. *See* footnote 7, *supra*, and concomitant text.

In light of the above circumstances, information as to: (1) the alarm system, (2) the presence and location of the surveillance cameras at the premises, (3) the existence and operations of the DVR recording device,[17] and (4) Azartash's familiarity with those items were clearly material to Defendant's investigation of Plaintiff's claim.

During various points[18] in: (1) his initial interview with Defendant's retained fire/property investigator (*i.e.* Bonelli) on November 2, 2015, (2) his recorded interview on December 1, 2015 with Defendant's claims representative (*i.e.* Guerrero), and (3) his May 12, 2016 examination under oath, Azartash made the following false and/or misleading statements to the Defendant:

(1) Azartash initially stated that he was unaware of the locations of the security cameras at the Premises and that there were none inside of the building. He thereafter claimed that he was

---

[16] While Azartash asserted that Berrera had knowledge of the code, at trial, Berrera denied ever being given the code. *See* 4/30/19 Tr. Trans. at 126-27.

[17] As stated by Bonelli, the DVR recordings "would have caught the fire initiation," how it "happened," and whether anyone was involved in its initiation. *See* 5/1/19 Tr. Trans. at 96.

[18] At various times, Azastash would make a false and/or misleading statement to Defendant's agents and later give another version. The Court finds that – often, the initial statement was so indisputably wrong when the correct facts were so clearly within Azartash's knowledge – the original erroneous/misleading information was intentionally provided. For example, initially Azartash stated that he was unaware if there were security cameras inside of the building even though Gomez testified that Azartash had hired him to install additional security cameras inside the structure.

not familiar with the details and/or operation of the security/surveillance system because it had originally been installed by the property owner and had not been altered by anyone at Everyday Discount.  He further said that Plaintiff did not add or take away any of the cameras.  All of those statements were contradicted by Gilbert Gomez who testified that, months before the conflagration, Azartash had hired him to relocate certain of the outside cameras, to add two additional outside cameras, to reposition three of the interior cameras and to add an additional interior camera.

(2) Azartash initially stated that he was unaware if the security cameras were ever connected to a DVR recording device.  He, thereafter, said that there was a DVR device at one time in the office area; but that it was the building owner's property and was removed between 4-8 months before the fire.  Those statements were contradicted and/or are found to be misleading based on the testimony of: (a) Plaintiff's employees Bernard Melo and Loudes Manalac who recalled there being (before the day of the fire) a DVR into which the security cameras and television monitors were connected; and (b) Gomez who stated that, pursuant to Azartash's requests regarding the security/surveillance system, he installed a new DVR into which he connected the cameras and monitors; and he observed that all were operational two days before the conflagration.

(3)  Despite his initial statements regarding his lack of knowledge as to whether the security cameras were connected to any device, in his May 12, 2016 examination he said that there was a 42" monitor which was placed in the hallway outside of the office which would show live feed from the cameras.  However, he stated that it was the landlord's monitor and the owner removed it months before the fire.  At the trial, Azartash testified that he had Gomez install the TV monitor outside of the office to show customers in the store that they were being observed on camera.  However, Azartash also said that the monitor was part of Plaintiff's inventory which he had removed from the hallway and placed back into the sales stockpile.

### 2. Plaintiff's alleged violations of the Policy upon which this decision does not rest
#### a) "Out of sight" inventory claim

Defendant further contends that "Everyday Discount, through Mike Azartash, also made intentional misrepresentations of material fact regarding the nature and extent of the $436,536.60 'Out of Sight' inventory claimed to be destroyed by the fire."  *See* Docket No. 83 at 15 of 16.

Because the Court has found that Plaintiff violated the fraud provision of the Policy in several respects, it does not reach a conclusion on this additional contention.

The original inventory report, which was prepared by Strictly Contents with the assistance of Plaintiff's employees, set the total loss at $269,809.32. *See* Stipulations at ¶12. Months later after it was provided with that report, Plaintiff submitted a Sworn Statement in Proof of Loss which, *inter alia*, revised the original Strictly Contents loss total to $787,221.19, and claimed that there was an additional $436,536.60 worth of merchandise which was "out of sight" (presumably on the second floor) and unaccounted for in the report. *See* Tr. Ex. 2. At trial, the parties submitted the original "Strictly Contents Total Loss inventory" (Tr. Ex. 3), the "787,000 Revised Strictly Contents Inventory" (Tr. Ex. 4), the "$36,536.60 Out of Sight Inventory" (Tr. Ex. 7), and Vendor Invoices" (Tr. Ex. 8) which purportedly supported Plaintiff's calculations. *See* List of Exhibits and Witnesses, Docket No. 74.

Defendant initially makes a broad argument based on a contention that there was insufficient evidence of there being $436,536.60 worth of merchandise on the second floor of Plaintiff's business. Defendant points out that, within days of the fire, Juventino Ortega from Strictly Contents conducted an inventory of the damaged/destroyed merchandise at to the Premises. He stated that, when he went up to the second floor, he could not inspect the entire floor because of safety issues. But he was able to see the entire second floor and that, apart from a closet full of boxes, there was no other merchandise that he could see on that floor. A number of photographs were presented at trial which were, to some extent, consistent with that testimony.[19] On the other hand, Everyday Discount employee Carlos Barrera testified that prior to the conflagration, two of the rooms on the second floor were full of merchandise, although after the fire he never went to the second floor to determine what if any items were destroyed or damaged by the fire. Also, Gilbert Gomez testified as to there being merchandise on the second floor.

Even accepting the existence of merchandise on the second floor, there remains a question as to whether Plaintiff's submission of the "out of sight" inventory claim was misleading. Azartash stated that Plaintiff generally had around 2,000 items for sale. The initial Strictly Contents report listed 4,836 separate categories of goods which were accounted for. Also, because the original

---

[19] There was evidence that there were three rooms on the second floor, a music room used by Nima Azartash (which was not part of Plaintiff's business) and two showrooms. It is not clear that Ortega was aware of that purported fact and that, when he testified as to having seen the entire second floor, he was able to see all three rooms. The photographs, which were submitted at trial, do not show all three rooms.

Strictly Contents report was prepared with the assistance of Everyday Discount employees, it is unclear how those employees could have overlooked (or been unaware of) over $436,000 worth of merchandise allegedly stored on the second floor of the Premises.  To determine whether Plaintiff falsified its losses by claiming non-existent or grossly inflated additional goods purportedly stored on the second floor would require a detailed examination of the hundreds of pages which comprise the competing loss reports that in turn referenced thousands of items of merchandise, and also their concomitant supporting documents including invoices.  That task was not undertaken by the parties apparently either before or at the trial and the Court will not take up the laboring oar at this point.

b) <u>Failure to cooperate in the investigation of the claim</u>

Although Defendant originally raised certain contentions regarding Plaintiff's alleged failure to cooperate in regards to the investigation of its claim, by the end of the trial, that defense was not litigated.  *See, e.g.,* Defendant State Farm General Insurance Company's Closing Argument Brief (Docket No. 83), which does not mention the duty to cooperate or its corresponding provision in Section I (Conditions) in paragraph 3 of the Policy.

## IV.  Conclusion

For the reasons stated above, the Court finds in favor of the Defendant and against Plaintiff. Defendant is to prepare a proposed judgment.